LAUREN I. SCHOLNICK (Bar No. 7776)
JONATHAN K. THORNE (Bar No. 12694)
**STRINDBERG & SCHOLNICK, LLC**
675 East 2100 South, Suite 350
Plaza 7-21
Salt Lake City, UT 84106
Tel: (801) 359 4169
Fax: (801) 359 4313
lauren@utahjobjustice.com
jonathan@utahjobjustice.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**
**CENTRAL DIVISION**

| | |
|---|---|
| **JOBY BRATCHER,** | |
| Plaintiff, | **COMPLAINT** |
| v. | **(Jury Demanded)** |
| **CHEVRON CORPORATION.,** a corporation; **CHEVRON U.S.A. INC.** a corporation d/b/a **CHEVRON PRODUCTS COMPANY.** | Civil No. 1:14cv00055 |
| Defendants. | U.S. District Judge: Furse |

Joby Bratcher ("Mr. Bratcher" or "Plaintiff"), by and through his undersigned attorneys, hereby complains and alleges against Defendants Chevron Corporation, Chevron U.S.A. Inc., and Chevron Products Company as follows:

## NATURE OF THE CLAIMS

1. This action is brought against Defendants pursuant to: 42 U.S.C. § 1981 ("§ 1981") for discrimination and retaliation; 42 U.S.C. § 2000e et seq. ("Title VII") for retaliation, and Utah state law for intentional interference with an economic relation.

2. Plaintiff seeks damages, attorneys' fees, costs and interest, emotional distress, punitive, compensatory, and all other awardable damages.

## PARTIES

3. Plaintiff Mr. Bratcher resides in the State of Utah, Davis County, and was working at Defendants' ("Chevron" or "Defendants") Salt Lake City, Utah refinery at all times relevant to the allegations in this Complaint.

4. Chevron Corporation is a Delaware corporation that operates a refinery in Salt Lake City, Utah. Plaintiff was employed at this refinery.

5. Chevron U.S.A. Inc. ("Chevron USA") is a Pennsylvania corporation, doing business in Utah. Chevron USA does business as several companies in Utah, including Chevron Products Company. Upon information and belief, Chevron USA is a subsidiary of Chevron Corporation, and manages and operates most of Chevron Corporation's United States businesses.

6. Chevron Products Company is a DBA of Chevron USA doing business in Utah. In response to Plaintiff's Charge of Discrimination against Chevron Corporation, Chevron Products Company claimed it was the appropriate entity to respond to the Charge, and further indicated that Chevron Products Company was "a division of Chevron U.S.A. Inc."

7. Based on the foregoing and upon information and belief, all Defendants are a single and/or joint enterprise. As such Defendants jointly operate and manage the Salt Lake City, Utah refinery where Plaintiff was employed. Defendants will collectively be referred to as "Chevron" or "Defendants".

## JURISDICTION AND VENUE

8. This court has jurisdiction over the claims against Defendants pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because Plaintiff's claims either arise under federal law or are supplemental to such federal question claims.

9. Venue is proper in this District pursuant to 29 U.S.C. § 1391 as the events alleged herein all took place within and Defendants are either located or operate a business within this judicial district.

## ADMINISTRATIVE PROCEEDINGS

10. Plaintiff filed a timely Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC").

11. On January 30, 2014, EEOC issued Plaintiff a *Notice of Right to Sue*.

12. All administrative prerequisites have been met.

## FACTUAL BACKGROUND

13. Joby Bratcher is an African American, who began working at the Chevron refinery after he was hired by Holmes & Holmes Industrial, Inc. ("Holmes & Holmes") in approximately April 2006.

14. Holmes & Holmes is a construction company that performs excavation, concrete, and pipe welding services throughout Utah, and contracts with Chevron to provide refinery employees.

15. Upon information and belief, the workforce operating Chevron's refinery is primarily comprised of employees of companies that contract with Chevron to provide services/labor to the refinery, including such companies as Holmes & Holmes, and Plaintiff's subsequent employer, Brahma Group, Inc. ("Brahma").

16. Although Chevron utilizes subcontractors to provide its workforce, Chevron acts as a joint employer of these subcontractors' employees by exercising significant control over these employees. This includes but is not limited to the following:

   a. Controlling the hiring of subcontractor employees by determining which employees are authorized to work at the refinery;

   b. Providing all training, including human resource training, training on Chevron policies and procedures; chemical training; and safety training;

   c. Firing subcontractor employees;

   d. Ejecting subcontractor employees from the refinery, refusing them access to the refinery property, or refusing to allow them to work;

   e. Directing subcontractors to discipline and/or fire its employees;

   f. Assigning daily work directly to subcontractor employees;

   g. Assigning work indirectly through a subcontractor foreman;

   h. Approving subcontractor employee work schedules and overtime; and

      i. Drug testing subcontractor employees.

17. During the time he worked at the Chevron refinery, both Mr. Bratcher and his brother, Antonio Bratcher, who was also an African American employee of Holmes & Holmes, were subjected to racial harassment.

18. This included repeatedly being called the "N" word and being subjected to degrading and racist jokes.

19. Paul Facer, Holmes & Holmes' foreman, was the main perpetrator of this racial discrimination. On numerous occasions over a several year period, Plaintiff and Antonio Bratcher complained about the discrimination to Holmes & Holmes, including telling Mr. Facer to cease and reporting to Holmes & Holmes' owners and Human Resources Director. Despite these reports, Holmes & Holmes did not stop the discrimination.

20. As a result, on or about August 18, 2008, Antonio Bratcher reported to Don Brady, Chevron's Safety Observer, that he and Plaintiff were experiencing racial harassment/discrimination at Chevron's refinery.

21. Later that day, Plaintiff and Antonio Bratcher ("Bratcher brothers") reported the same thing to Casey Valdez, Chevron's Routine Maintenance Team Lead. They told Mr. Valdez that they had reported this numerous times to no avail and asked him to intervene.

22. The Bratcher brothers asked Mr. Valdez to attend a meeting with Holmes & Holmes wherein they would address the ongoing racial harassment/discrimination. They

explained to Mr. Valdez they needed him to attend to lend his support because they felt intimidated each time they complained. Mr. Valdez agreed to attend the meeting.

23. The Bratcher brothers also told Mr. Valdez that numerous Chevron refinery supervisors were aware of and had witnessed the racial harassment/discrimination, including John Weaver, Tony McCluskie and Gary Reamer, but had not done anything to stop it.

24. Following his meeting with Mr. Valdez, Antonio Bratcher contacted Ron Holmes, owner of Holmes & Holmes, and scheduled a meeting for August 20th to discuss the ongoing racial harassment/discrimination. Mr. Bratcher informed Mr. Holmes that representatives from Chevron, including Mr. Valdez, were planning on attending.

25. The next day, on August 19th, Chevron required Holmes & Holmes to drug test the Bratcher brothers.

26. Chevron told Holmes & Holmes that it received a report from James Dawson that several of Holmes & Holmes employees at the refinery were doing drugs, including Paul Facer, Bill Nay, Shad Pixton and Joby Bratcher, and that Holmes & Holmes had to drug test Plaintiff and his brother.

27. Upon information and belief, Plaintiff and his brother were the only employees actually required to take a drug test, which both passed.

28. Upon information and belief, Mr. Dawson had actually reported only that Mr. Facer was doing drugs and harassing the Bratcher brothers. However, Chevron did not require Mr. Facer take a drug test.

29. On approximately August 20, 2008, the Bratcher brothers attended the meeting with Mr. Holmes and two other representatives of the company. Neither Mr. Valdez, nor anyone else from Chevron attended the meeting, despite Mr. Valdez's commitment to do so.

30. The following day, Chevron again required both the Bratcher brothers to be drug tested, even though Chevron had drug tested them two days earlier.

31. Antonio Bratcher informed Mr. Valdez that they had just been tested and considered this additional drug test nothing more than harassment for reporting the discrimination.

32. Mr. Valdez denied that Chevron had required the first test and claimed Holmes & Holmes had asked for the test.

33. However, when asked, Mr. Holmes responded that he had the recorded voicemail of a Chevron representative instructing him to drug test the Bratcher brothers.

34. Mr. Valdez oversaw the August 21st drug test for Chevron. After he collected Antonio's sample Mr. Valdez claimed that the sample felt too cold and that Antonio would have to take another test. When Antonio objected, the test technician looked at the thermometer and indicated that the temperature was fine. Mr. Valdez then demanded that Antonio leave the building

35. Mr. Valdez made the same allegation when he collected Plaintiff's sample, claiming that the sample was too cold and demanding that Plaintiff retake the test. However, the temperature of the sample was within the acceptable range.

36. Plaintiff then had to wait for a considerable period of time until he was able to again urinate, at which time he again provided a second urine sample. The technician took the sample and poured it out, claiming that Plaintiff had not provided enough urine, even though it was well beyond what was necessary to test. Mr. Valdez then demanded that Plaintiff provide yet a third sample.

37. Plaintiff again had to sit and wait before he was be able to provide another sample. By this point a couple of hours had already passed since Plaintiff had provided the first sample.

38. While Plaintiff was waiting to urinate for the second time, he received a call from his wife, Susan, telling him that their three year old son had split open his head. She had 6 children (five of whom were under 8 and one who was 8 months old) with her and was rushing him to the hospital. She needed Mr. Bratcher to meet her there.

39. After he provided, the second sample, Plaintiff informed Mr. Valdez of his son's head injury and explained that he needed to leave for the hospital.

40. Mr. Valdez said that if Plaintiff left he would be treated as having failed the drug test and would be immediately fired. Plaintiff responded that he was not trying to avoid being tested and had already provided two urine samples that day. Plaintiff also reminded Mr. Valdez that he had passed a drug test two days earlier and would be willing to come back and provide another sample after he went to the hospital to care for his son.

41. Mr. Valdez then grabbed Plaintiff's name tag and told Plaintiff that he was fired.

42. Chevron sent Plaintiff's first urine sample to the lab and it was a clean test, indicating that Mr. Bratcher had not used drugs. Chevron still would not allow Mr. Bratcher to return to work.

43. Although diligently looking for work, Plaintiff was unemployed for approximately three years.

44. In April 2009, the Bratcher brothers filed a Charge of Discrimination with EEOC alleging racial harassment/discrimination against Holmes & Holmes, which lead to EEOC filing a lawsuit on that Charge on September 28, 2010. The Bratcher brothers intervened in that suit and brought their own claims under 42 U.S.C. § 1981. That lawsuit was resolved at the end of March 2013.

45. While the suit was proceeding in federal court and approximately three years after being fired, Brahma, another Chevron subcontractor, offered Plaintiff a position as a pipe fitter at the Chevron refinery in July 2011.

46. When a Chevron subcontractor offers someone a position at the refinery, the subcontractor is required to report the name of the potential new hire to Chevron and obtain permission for that employee to work at the refinery.

47. On July 28, 2011, Brahma submitted a "Contractor Approval Request" form to Chevron on behalf of Mr. Bratcher, requesting that he be allowed to work at the refinery. Chevron approved Mr. Bratcher for work and instructed him to report for a site specific training class at the refinery on August 1, 2011.

48. While the training was taking place, Mr. Valdez apparently learned that Mr. Bratcher had been hired by Brahma to work at the refinery and contacted Jake Barlow, Chevron's Security Coordinator, and had him eject Mr. Bratcher from the refinery.

49. Rick Rodriguez, Brahma's superintendent, contacted Mr. Valdez to determine why Mr. Bratcher was ejected. Mr. Valdez demanded to know why Mr. Rodriguez had hired Mr. Bratcher. Mr. Rodriquez responded that Plaintiff had previously been employed at the refinery, had been a good employee, and wanted to return to the refinery.

50. Mr. Valdez then asked Mr. Rodriguez if he knew about Plaintiff's lawsuit against Chevron's subcontractor, Holmes & Holmes, and then told Mr. Rodriguez that Chevron had banned Mr. Bratcher from the refinery for life and he could not work at the refinery in any capacity.

51. Plaintiff attempted to discuss this lifetime ban with Mr. Valdez so he made an appointment to meet with Mr. Valdez at the refinery. After waiting for approximately 1.5 hours, Plaintiff was informed that Mr. Valdez would not meet with him.

52. Because Chevron refused to allow him to work at the refinery, Mr. Bratcher lost his job with Brahma.

## FIRST CAUSE OF ACTION
### (Retaliation in Violation § 1981 and Title VII)

53. Mr. Bratcher realleges and incorporates by reference those paragraphs set forth above.

54. After being subjected to racial harassment and discrimination, Mr. Bratcher filed a Charge of Discrimination with the EEOC, which subsequently filed a lawsuit on that Charge (and Mr. Bratcher himself filed a §1981 claim) against Holmes & Holmes, his former employer and a Chevron subcontractor.

55. Mr. Bratcher's actions in filing a Charge of Discrimination and intervening in the lawsuit against Holmes & Holmes constitutes protected activity in opposition to discrimination under 42 U.S.C. § 2000e-3(a) and 42 U.S.C. § 1981.

56. Chevron was aware of Mr. Bratcher's participation in the discrimination lawsuit.

57. During the pendency of the litigation, Brahma, a Chevron subcontractor hired Mr. Bratcher to work at Chevron's refinery.

58. After Mr. Bratcher had started a Chevron training class, Chevron removed him from the class and ejected him from Chevron's property, while informing him that he was banned from the facility for life.

59. Chevron's actions interfered with and led directly to Mr. Bratcher's employment with Brahma being ended.

60. Chevron's refusal to allow Mr. Bratcher to work at the refinery was because of Mr. Bratcher's protected activities as described above.

61. Chevron's conduct constitutes retaliation under 42 U.S.C. § 1981 and Title VII.

62. As a result of Defendants' unlawful conduct, Mr. Bratcher has been injured and is entitled to recover lost back wages and benefits, future lost wages and benefits, and compensatory damages for emotional distress and suffering.

63. Because Defendant's discriminatory actions were done maliciously and in reckless and wanton indifference to Plaintiff's civil rights, Plaintiff seeks punitive damages sufficient to prevent Defendant from engaging in similar hiring practices, and to send a clear signal that such intentional and flagrant discrimination will not be tolerated in the State of Utah.

64. Mr. Bratcher is entitled to his reasonable attorneys' fees and costs under 42 U.S.C. § 2000e-5(k).

## **SECOND CAUSE OF ACTION**
**(Discrimination in Contracting under 42 U.S.C. § 1981)**

65. Mr. Bratcher realleges and incorporates by reference those paragraphs set forth above.

66. Section 1981 provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." It protects individuals from racial discrimination during the making of contracts.

67. Mr. Bratcher's actions in filing a Charge of Discrimination and later being named as a Plaintiff in litigation against Holmes & Holmes constitutes protected activity in opposition to an unlawful employment practice under 42 U.S.C. § 2000e-3(a) and 42 U.S.C. 1981.

68. Chevron was aware of Mr. Bratcher's participation in the discrimination lawsuit.

69. During the pendency of the litigation, Brahma, a Chevron subcontractor hired Mr. Bratcher to work at Chevron's refinery.

70. After Mr. Bratcher had started a Chevron training class, Chevron removed him from the class and ejected him from Chevron's property, while informing him that he was banned from the facility for life.

71. Chevron refused Mr. Bratcher a contract to access its refinery property as a result of his protected activity.

72. Chevron's actions also interfered with Mr. Bratcher's employment contract with Brahma.

73. Chevron's refusal to allow Mr. Bratcher to work at the refinery was because of Mr. Bratcher's protected activities as described above.

74. Chevron's conduct constitutes violations of 42 U.S.C. § 1981.

75. As a result of Defendants' unlawful conduct, Mr. Bratcher has been injured and is entitled to recover lost back wages and benefits, future lost wages and benefits, and compensatory damages for emotional distress and suffering.

76. Because Defendant's discriminatory actions were done maliciously and in reckless and wanton indifference to Plaintiff's civil rights, Plaintiff seeks punitive damages sufficient to prevent defendant from engaging in similar hiring practices, and to send a clear signal that such intentional and flagrant discrimination will not be tolerated in the State of Utah.

77. Plaintiff is also entitled to reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

## THIRD CAUSE OF ACTION
### (Intentional Interference with an Economic Relation)

78. Mr. Bratcher realleges and incorporates by reference those paragraphs set forth above.

79. Chevron intentionally refused to allow Mr. Bratcher to work at its refinery after he was hired by Brahma. By doing so, Chevron interfered with Mr. Batcher's employment, which lead to him losing his job at Brahma.

80. Chevron took this action to injure and punish Plaintiff for having filed his original charge of discrimination and subsequent lawsuit.

81. Chevron's acted with for an improper purpose and as a result of Chevron's actions, Mr. Bratcher's job was terminated and he has suffered lost wages and benefits among other things.

82. Mr. Bratcher is entitled to recover lost wages and benefits, and for compensatory and punitive damages in an amount to be determined at trial.

## JURY DEMAND

Plaintiff, by and through counsel of record, and pursuant to Fed. R. Civ. P. 38 hereby demands a trial by jury of any issue triable of right by jury.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for judgment against Defendants as follows:

1. For an order and judgment against Defendants for appropriate back pay, lost benefits and reimbursement for any other of Plaintiff's pecuniary losses;

2. For reinstatement (removal of his lifetime ban) or front pay in lieu of reinstatement;

3. For compensatory damages to compensate Plaintiff for his emotional distress, loss of enjoyment of life, and other non-pecuniary losses in amounts to be established at trial;

4. For Plaintiff's reasonable attorneys' fees and costs of court;

5. For punitive damages in substantial, appropriate, and reasonable amounts; and

6. For such further and other relief the court deems appropriate.

DATED this 29th day of April, 2014

**STRINDBERG & SCHOLNICK, LLC**

/s/ Jonathan K. Thorne
Jonathan K. Thorne
Lauren I. Scholnick
*Attorneys for Plaintiff*

b:\currentclientsut\bratcher,joby\pleadings\complaint final.docx